ON APPLICATION FOR REHEARING
The State's application for rehearing is granted. The opinion issued in this cause on December 3, 1993, is withdrawn and the following substituted therefor:
Stacey Kidd, a juvenile, was certified to stand trial as an adult for the offenses of murder and attempted murder.[1] The charges against Kidd were connected in their commission and were consolidated for trial. A jury convicted Kidd of manslaughter in connection with the murder charge and acquitted him on the attempted murder charge. He was sentenced to eighteen years' imprisonment on the manslaughter conviction. This appeal is from that conviction and sentence.
 I
The appellant, Kidd, contends that the prosecutor improperly commented on his post-arrest silence and that the trial court erred in overruling his objections to those comments, in denying his motion for a mistrial based on those comments, and in failing to give curative instructions with regard to those comments.
The indictment charged that the appellant "intentionally caus[ed] the death of . . . Lester Wilson by stabbing him with a knife." C.R. 7. The State's case consisted primarily of the testimony of persons who witnessed some portion of the events surrounding the killing. The pathologist who performed the autopsy on the deceased testified, as did the evidence technician who processed the scene of the stabbing. Although there was testimony by one of the lay witnesses that the appellant was arrested in the witness's home after his mother had called the police, none of the arresting officers testified. In fact, aside from the evidence technician, no police officers were called by the State.
The appellant testified in his own behalf and, on direct examination, admitted stabbing Wilson, but denied that he had an intent to kill when he did so. According to the appellant, he and Wilson had an altercation over a sum of money that he claimed Wilson had taken from him. The stabbing occurred while Wilson "was choking [him] over the bannister." R. 451. The appellant stated: "I ain't try to kill him. I [stabbed him] just to protect myself." R. 452. He testified that when he left the scene of the altercation, he took the knife he had used to stab Wilson with him and "put the knife under the bumper of a car" that was "down the block." R. 445. The appellant stated that he "later turned [him]self in to the police." R. 447.
During cross-examination of the appellant, the following occurred:
 "Q. (By Mr. Stokesberry [assistant district attorney]): Did you ever tell anybody where that knife was left? *Page 1306 
"A. Yes.
"Q. Who did you tell?
"A. Police.
"Q. When did you tell the police?
 "A. I think they asked me where did I put it at when I got to the station. And then that was the only statement that I made. They asked me where was the weapon.
"Q. And that's all you told them, where it was?
"A. Yes, sir.
 "Q. Some reason you put it . . . underneath the bumper?
"A. I didn't want to take it with me.
 "Mr. Stokesberry: I don't have any other questions, Judge." R. 547-48 (emphasis added).
During his rebuttal closing argument, the prosecutor stated:
 "I want to ask you this question. What was his testimony about the truth? What did he tell you? He said from his own mouth on the witness stand, 'I talked to the police, and all I told them was where the weapon was.' He said it. It came out of his mouth." R. 583-84.
Defense counsel objected to these comments, stating that the appellant "had a right not to talk to the police," because he had "invok[ed] his Miranda[2] rights to remain silent." R. 584 (footnote added). The trial court overruled the objection as to comments "allegedly said by the defendant to the police," but "sustain[ed] in that regard." Id. When the prosecutor sought clarification of this ruling, the trial court stated: "As to anything the defendant said he told the police, I'll let you comment on that. I would sustain as to any further regard to it." R. 584-85.
Later in his rebuttal argument, the prosecutor stated: "Now, if he wanted to tell the truth, why did he wait? I'll leave that to your determination. Use your common sense and your knowledge —." R. 585. Defense counsel again objected, making reference to proceedings in juvenile court and asserting that "the regulations are different." Id. The following then occurred:
 "Mr. Stokesberry: Your Honor, I would state that his testimony from this stand was, he talked to the police and he volunteered that.
 "The Court: I would overrule on that basis. You may proceed.
 "Mr. Stokesberry: So use that. He wants to tell the truth, why does he wait?
 "Mr. Turberville [defense counsel]: Your Honor, I object . . . and I ask for a mistrial. . . . [The appellant] has a right to invoke his right to remain silent, and that cannot be commented on by the prosecution. And he has no duty to give any evidence, to give any testimony. . . . So I ask for a mistrial, and in lieu of that I ask for a curative instruction and ask that that total line be disregarded by the good jury.
 "The Court: Well, I'm going to overrule the motion for a mistrial, and I'll address this matter in the Court's charge to the jury. So, I'll give a curative instruction." R. 585-87.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91
(1976), the United States Supreme Court held that "the Due Process Clause of the Fourteenth Amendment" is violated when a prosecutor uses a defendant's "silence, at the time of arrest and after receiving Miranda warnings," "to impeach [the] defendant's exculpatory story [that is] told for the first time at trial." 426 U.S. at 619, 611, 96 S.Ct. at 2245, 2241. As the Court stated:
 "Silence in the wake of these [Miranda] warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, . . . post-arrest silence [after the Miranda warnings have been given] is insolubly ambiguous because of what the State is required to advise the person arrested. . . . Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."
426 U.S. at 617-18, 96 S.Ct. at 2244-45. Subsequent decisions of the Supreme Court "confirm that 'Doyle rests on "the fundamental unfairness of implicitly assuring a suspect *Page 1307 
that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." ' " Greer v. Miller, 483 U.S. 756, 763, 107 S.Ct. 3102,3107, 97 L.Ed.2d 618 (1987).
However, the Supreme Court has "consistently explainedDoyle as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him." Fletcher v. Weir, 455 U.S. 603, 606,102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982). In state prosecutions,Doyle does not apply "[i]n the absence of the sort of affirmative assurances embodied in the Miranda warnings."Fletcher v. Weir, 455 U.S. at 607, 102 S.Ct. at 1312. "Thus, the key to the exclusionary rule of Doyle is the giving ofMiranda warnings." Sulie v. Duckworth, 689 F.2d 128, 132 n. 1 (7th Cir. 1982) (Cudahy, J., dissenting), cert. denied,460 U.S. 1043, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983).
At trial, Zonovia Weaver testified that the appellant was arrested at her house on the afternoon of May 4, 1991. While there was no testimony as to whether anyone had informed the appellant of his Miranda rights, there is a notification of rights form signed by the appellant in the record. C.R. 23. This form contains the "juvenile Miranda warnings," see Rule 11(A), A.R.Juv.P., and is dated "May 4, 1991 Time 12:10 PM." C.R. 23. We are unable to determine from the record whether the appellant was notified of his rights before or after making the statement concerning the location of the knife.
The timing of the appellant's statement is crucial because the Fifth Amendment forbids only comment upon a defendant's post-arrest, post-Miranda silence. Doyle v. Ohio, supra. There is no prohibition against comment on a defendant's pre-arrest, pre-Miranda silence. Jenkins v. Anderson, 447 U.S. 231,100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); Ex parte Pippens,621 So.2d 961 (Ala. 1993); Donahoo v. State, 647 So.2d 24
(Ala.Cr.App. 1994).*
Furthermore, Doyle only prohibits the prosecutor's making the defendant's silence the subject of comment. "[A] defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent." Anderson v. Charles,447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980). Therefore, if the accused makes a post-Miranda statement, any inconsistency between that statement and the defendant's trial testimony may fairly be made the subject of comment by the prosecutor. Anderson v. Charles, 447 U.S. at 408,100 S.Ct. at 2182; Reeves v. State, 591 So.2d 566, 569 (Ala.Cr.App. 1991);Bogan v. State, 529 So.2d 1029, 1030 (Ala.Cr.App. 1988);Bradley v. State, 494 So.2d 750, 767 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala. 1986), cert. denied,480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987).
We cannot determine from the record before us the sequence of or the circumstances surrounding (1) the appellant's statement about the location of the knife, (2) the appellant's notification of his Miranda rights, and (3) the appellant's decision to make no further statements. This cause is therefore remanded and the trial court is directed to conduct a hearing to determine the order in which these events occurred and the circumstances surrounding these events.
If the appellant made the statement about the knifebefore he was given his Miranda rights and then, having been warned of his right to remain silent, he invoked that right and said no more, then the prosecutor's comment falls within the holding of Doyle and may require a reversal of the appellant's conviction.[3]
On the other hand, if the appellant made the statement about the knife after having received his Miranda warnings, then the *Page 1308 
prosecutor's comment about the appellant's failure to tell the police that the stabbing was done in self-defense falls outside the holding of Doyle and was not improper. See Anderson v.Charles, 447 U.S. at 408, 100 S.Ct. at 2182; Reeves v. State, 591 So.2d at 569; Bogan v. State, 529 So.2d at 1030; Bradley v.State, 494 So.2d at 767.
 II
After the jury was struck, both the prosecutor and defense counsel made motions pursuant to Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor challenged defense counsel's strikes of three of the seven black veniremembers and defense counsel challenged the prosecution's use of its seven peremptory strikes to remove seven white veniremembers. Without ruling on whether the State had established a prima facie case of racial discrimination, the trial court required defense counsel to explain his strikes of the black veniremembers. The court then found those reasons to be race-neutral. Defense counsel's Batson motion was overruled because the trial court "d[id not] know at this time whether [striking white veniremembers] is grounds for a Batson
challenge." R. 13.
The appellant's trial was held July 20-24, 1992, and notice of appeal was filed on October 29, 1992. On February 12, 1993, a majority of this Court expressly held that Batson applies to strikes of white veniremembers. Williams v. State,634 So.2d 1034 (Ala.Cr.App. 1993) (white defendant challenged prosecutor's strikes of white veniremembers). While not expressly deciding the issue, the Alabama Supreme Court has assumed in two civil cases that Batson applies to strikes of white veniremembers. Phillips Colleges of Alabama, Inc. v.Lester, 622 So.2d 308, 313 (Ala. 1993) (where corporate defendant challenged black plaintiff's strikes of white veniremembers, Court "[a]ssum[ed], without deciding, thatBatson applies under the facts of this case"); White Consol.Indus. v. American Liberty Ins. Co., 617 So.2d 657, 659 (Ala. 1993) ("for purposes of responding" to corporate defendant's argument that insurance company, suing as subrogee to interests of injured plaintiff, had failed to provide race-neutral reasons for its strikes of white veniremembers, Court "assume[d] that [the Batson] safeguards apply to the striking of white venirepersons"). See also Huntley v. State,627 So.2d 1013, 1018 n. 7 (Ala. 1992) (Maddox, J., concurring specially) ("[b]ecause the Batson rule now applies to a criminal defendant's peremptory challenges, if this defendant again uses all of his peremptory challenges to remove whites, then his strikes can also be challenged"). Like Powers v. Ohio,499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which held that white defendants have standing to make Batson challenges, andBatson itself, Williams applies retroactively to cases that were pending on direct appeal when that case was decided. SeeJackson v. State, 594 So.2d 1289, 1291-92 (Ala.Cr.App. 1991), and cases cited therein.
We remand this cause to the trial court with directions that that court conduct a hearing and give the appellant an opportunity to establish a prima facie case of purposeful discrimination by the State in its use of its peremptory challenges. We note that in addressing the Batson motions made by the parties at trial, the trial court stated:
 "I have no idea what a prima facie case is. The appellate courts, in their infinite wisdom, has [sic] never indicated what a prima facie case is. What makes up a prima facie case to one is not to the other [sic]. I know that this is taken down and possibly read by the appellate court, and what I'm asking for is for them to give us guidance as to what a prima facie case is." R. 9.
Batson prohibits "[s]election procedures that purposefully
exclude . . . persons [of a particular race] from juries."Batson, 476 U.S. at 87, 106 S.Ct. at 1718 (emphasis added). See also Hernandez v. New York, 500 U.S. 352, 362, 111 S.Ct. 1859,1867, 114 L.Ed.2d 395 (1991) ("Equal Protection analysis turns on the intended consequences of government classifications. Unless the government actor adopted a criterion with the intent
of causing the impact asserted, that impact itself does not violate the principle of race-neutrality.") (emphasis added);Batson, 476 U.S. at 90, 106 S.Ct. at 1719 ("[a] recurring question in these cases, as in any *Page 1309 
case alleging a violation of the Equal Protection Clause, was whether the defendant had met his burden of provingpurposeful discrimination on the part of the State") (emphasis added). Consequently, the prima facie case required by Batson
consists of facts and circumstances that raise an inference that the challenged party engaged in purposeful or intentional
racial discrimination in the selection of the jury. SeeBatson, 476 U.S. at 96, 106 S.Ct. at 1723 ("a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial") (emphasis added); Phillips Colleges ofAlabama, Inc. v. Lester, 622 So.2d at 313 (challenging party "presented no evidence to trial court from which an inference of intentional racial discrimination could be inferred") (emphasis added).
In determining whether the challenging party has established a prima facie case of purposeful or intentional racial discrimination, the trial court "is to consider 'all relevant circumstances' which could lead to an inference of [such] discrimination." Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987). In Ex parte Branch, 526 So.2d at 622-23, the Alabama Supreme Court identified a number of factors that the challenging party might use to establish a prima facie case of discrimination. This list of factors, while "not exclusive" of the means by which a challenging party may establish a prima facie case, Harrell v. State, 555 So.2d 263, 267 (Ala. 1989), is as follows:
 1. "Evidence that the 'jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.' " Ex parte Branch, 526 So.2d at 622.
 2. "A pattern of strikes against [jurors of a certain race] on a particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors." Id. at 623.
 3. "The past conduct of the [challenged party's] attorney in using peremptory challenges to strike all [jurors of a particular race] from the jury venire." Id.
 4. "The type and manner of the [challenged party's] attorney's questions and statements during voir dire, including nothing more than desultory voir dire." Id.
 5. "The type and manner of questions directed to the challenged juror, including a lack of questions or a lack of meaningful questions." Id.
 6. "Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner." Id.
 7. "Disparate examination of members of the venire," such as asking only jurors of a particular race "a question designed to provoke a certain response" likely to disqualify those jurors. Id.
 8. "Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike [members of a particular race] from the jury." Id.
 9. "The [challenged party] used peremptory challenges to dismiss all or most [jurors of a particular race]." Id.
The Branch factors have been repeated in a number of cases. See, e.g., Ex parte Bird, 594 So.2d 676, 679-80 (Ala. 1991);Harrell v. State, 555 So.2d at 266-67; Hemphill v. State,610 So.2d 413, 415 (Ala.Cr.App. 1992). See also Phelps, BatsonChallenges From the Perspective of a Trial Judge — SomePractical Considerations, 54 Ala. Law. 320, 320-21 (1993).
With regard to the second, eighth, and ninth Branch factors, it should be noted that "[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case." Edwards v. State,628 So.2d 1021, 1024 (Ala.Cr.App. 1993) (defendant's "Batson
motion was based solely on the fact that the State struck two blacks who 'never answered any questions whatsoever' on voir dire").
 "As [the Alabama Supreme Court] explained in Harrell [v. State, 555 So.2d 263 (Ala. 1989)], a [challenging party] cannot *Page 1310 
prove a prima facie case of purposeful discrimination solely from the fact that the [challenged party] struck one or more [members of a particular race] from [the] jury. A [challenging party] must offer some evidence in addition to the striking of [members of one race] that would raise an inference of discrimination."
Harrell v. State, 571 So.2d 1270, 1271 (Ala. 1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991) (emphasis in original). See also, e.g., Ashley v. State,606 So.2d 187, 192 (Ala.Cr.App. 1992) (where state used three of its seven strikes to remove three of the seven black veniremembers, "appellant failed to establish a prima facie case under Batson and Ex parte Branch . . . because the appellant failed to show any evidence of discrimination other than the number of blacks struck"); Jones v. State,603 So.2d 419, 420 (Ala.Cr.App. 1992) (where defendant showed only that prosecution "used one of its seven strikes to remove a black from the venire" and "did not bring to the trial judge's attention any factor that might tend to show that the prosecutor purposefully discriminated against this potential juror on the basis of race," defendant failed to establish a prima facie case).[4]
Statistical evidence may be used to establish a prima facie case of discrimination. In both Ex parte Bird, 594 So.2d 676
(Ala. 1991), and Ex parte Yelder, 630 So.2d 107 (Ala. 1992), the prosecution struck substantial numbers of black veniremembers. In Bird, the venire was 36% black. The State used 17 of its 20 (85%) peremptory strikes to remove blacks, leaving a jury that was 8% black. In Yelder, the venire was 31% black. The State used 24 of its 32 (75%) strikes to remove blacks, leaving a jury that was 16% black. With reference to both cases, the Alabama Supreme court stated: "[T]he sheer weight of statistics such as these raises a strong inference of racial discrimination requiring clear and cogent explanations by the State in rebuttal." Ex parte Yelder, 630 So.2d at 109.
Statistical evidence may also be used to show the absence of discriminatory intent. In Harrell v. State, 571 So.2d at 1271, the venire was 35.7% black. The State used 5 of its 8 peremptory strikes to remove blacks, leaving a jury that was 41.7% black. With regard to these numbers, the Alabama Supreme Court stated "[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." Id. (There were, however, other factors in Harrell that were sufficient to establish a prima facie case of discrimination.) See also, e.g., Ex parteMcWilliams, 640 So.2d 1015 (Ala. 1993) (applying Harrell in affirming trial court's finding that challenging party had not established a prima facie case of purposeful discrimination);Jackson v. State, 623 So.2d 411 (Ala.Cr.App. 1993) (same);Powell v. State, 624 So.2d 220 (Ala.Cr.App. 1993) (same);DeBruce v. State, 651 So.2d 599 (Ala.Cr.App. 1993) (same);Davis v. State, 620 So.2d 136, 136-37 (Ala.Cr.App. 1993) (same); Flowers v. State, 608 So.2d 764, 765 (Ala.Cr.App. 1992) (same); Hood v. State, 598 So.2d 1022, 1023 (Ala.Cr.App. 1991) (same).
Obviously, the best way for the challenging party to establish a prima facie case is to make a showing on several of the Ex parte Branch factors. See Ex parte Bird, 594 So.2d at 680 ("the strength of [the challenging party's] prima facie case depends, in large part, on the number of these factors present"). For example, in Harrell v. State, 571 So.2d at 1272, the Court observed that *Page 1311 
"[t]he fact that the blacks struck include both men and women and that they were of a variety of ages, occupations, and social or economic conditions, indicates that race may have been the deciding factor." In addition, the prosecutor engaged in only limited voir dire and there was a prior case where that particular district attorney's office failed to rebut a prima facie case of discrimination. Id. See also, e.g., Ex parteBankhead, 625 So.2d 1146, 1147 (Ala. 1993) (defendant established a strong prima facie case where "State struck 8 of the 10 black veniremembers; the lead prosecutor . . . [had a history of] systematically exclud[ing] black veniremembers . . .; and the State had failed to conduct any meaningful voir dire of the excluded black veniremembers"); Smith v. State,620 So.2d 727, 729-31 (Ala.Cr.App. 1992) (where the defendant listed the nine Branch factors and argued specific evidence regarding each, the Court of Criminal Appeals simply stated that the evidence "provided by the appellant was sufficient to establish a prima facie case of discrimination pursuant to Exparte Branch"); Guthrie v. State, 598 So.2d 1013, 1019
(Ala.Cr.App. 1991) (prima facie case established where venire at time strikes were exercised was 23% black, State used 50% of its strikes "to eliminate 83% (10 of 12) of the black veniremembers," leaving a jury that was 8% black and, of "extreme significan[ce]," the prosecutor "fail[ed] to engage in any meaningful voir dire"), cert. denied, 598 So.2d 1020
(Ala. 1992).
The facts and circumstances necessary to establish a prima facie case of purposeful discrimination in the jury selection process will, of course, vary from case to case, depending on the particular facts and circumstances involved. In this regard, a trial court's determination of whether the challenging party has established a prima facie case of purposeful discrimination is not substantially different from its determination, when a motion for a judgment of acquittal is made, of whether the State has established a prima facie case that the defendant committed the particular crime charged. In the Batson context, the trial court need only determine whether the facts and circumstances advanced by the challenging party reasonably raise an inference that the challenged party engaged in purposeful discrimination in the exercise of its peremptory strikes. Cf. Morrison v. Booth, 763 F.2d 1366, 1371 n. 2 (11th Cir. 1985) (observing that, in a Title VII action, "[w]hether a prima facie case has been shown is a fact question. The test is 'whether an ordinary person could reasonably infer discrimination from the facts shown if those facts remain unrebutted.' "); Cook v. CSX Trans. Corp., 988 F.2d 507, 512
(4th Cir. 1993) (accord). While "[t]he trial judge has discretion in finding whether a prima facie case of purposeful discrimination has been proven," in exercising this discretion, "[t]he trial judge must be sensitive . . . to the demands of equal protection of the laws." Harrell v. State, 555 So.2d at 267.
 III
A motion for a new trial was timely filed by the appellant's retained trial counsel. Before the trial court ruled on this motion, trial counsel was permitted to withdraw, the appellant filed an affidavit of substantial hardship, and present appellate counsel was appointed to represent the appellant. Appellate counsel promptly requested a suspension of the time in which to file an amended motion for a new trial. See Exparte Jackson, 598 So.2d 895, 897-98 (Ala. 1992). After the court reporter's transcript was filed, appellate counsel filed an amended motion for a new trial that contained, among other contentions, the bare allegations that "[t]he defendant was subject to the incompetence of counsel" and that "[t]he defendant was prejudiced as a result of incompetent counsel." The amended motion does not identify any specific acts or omissions by trial counsel alleged to constitute ineffective assistance of counsel. Although the case action summary contains the following notation by the trial judge, "Amended motion for new trial set before me on 6-18-93 @ 8:30," there is no transcript of a hearing on the amended motion in the record before this Court. The case action summary recites only that the motion for new trial was denied on June 18, 1993.
Appellate counsel has raised the issue of "[w]hether [the appellant] was denied effective assistance of counsel at trial." Appellant's *Page 1312 
brief at 19. However, appellate counsel still fails to identify any specific acts or omissions by trial counsel alleged to constitute ineffective assistance of counsel. In fact, appellate counsel states that, in his opinion, trial counsel "more than met th[e] standard" of objective reasonableness defined in Strickland v. Washington, 466 U.S. 668, 687-89,104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984). Appellant's brief at 20. Appellate counsel then "requests this . . . Court to review the record and make a finding with regard to this issue." Id.
Except in cases where the death penalty has been imposed, see Rule 45A, A.R.App.P., "[t]his court is not required to search the record for error. See Rule 45B, A.R.A[pp].P." Kirby v.State, 563 So.2d 56, 58 (Ala.Cr.App. 1990). Moreover, it is not the policy of this Court to undertake such a review in cases where a sentence other than death has been imposed.
Furthermore, "[u]nder Strickland v. Washington, 466 U.S. 668,690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), a 'defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.' " Cook v. State,574 So.2d 905, 909 (Ala.Cr.App. 1990) (emphasis added). Because no allegedly unprofessional acts or omissions of trial counsel were identified at the trial level, much less in this appeal, there is nothing for this Court to review with regard to this issue. See Reynolds v. State, 615 So.2d 94, 96 (Ala.Cr.App. 1992).
For the reasons stated in Parts I and II of this opinion, this cause is remanded with directions for the trial court to hold a hearing on the Doyle and Batson issues, to make findings of fact and conclusions of law relating to both issues, and to submit a return to this Court within 60 days of the release of this opinion.
APPLICATION FOR REHEARING GRANTED; MOTION DENIED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REMANDED WITH DIRECTIONS.**
All Judges concur.
[1] The certification proceedings are not a part of the record before this Court and no issues related to that proceeding are raised in this appeal.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
* Note from the Reporter of Decisions: Presiding Judge Bowen's opinion cited the Donahoo opinion released February 11, 1994; that opinion was withdrawn and an opinion was substituted on April 15, 1994.
[3] Relying on Solomon v. Kemp, 735 F.2d 395 (11th Cir. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952
(1985), the attorney general argues that comment on a defendant's post-arrest, post-Miranda silence does not always constitute Doyle error. In our judgment, Solomon v. Kemp falls within the rule of Anderson v. Charles rather than the rule ofDoyle because the accused in Solomon was not induced to remain silent by the Miranda warnings; he spoke after he had received the warnings.
[4] We note that in Ex parte Williams, 571 So.2d 987, 990 (Ala. 1990), the Alabama Supreme Court stated that the defendant's "evidence that the State struck four of the five black venire members [was] sufficient evidence of discrimination to establish her prima facie case for discrimination." However, the trial court had made no determination of whether a prima facie case existed before requiring the prosecutor to explain his strikes and the Supreme Court reversed the defendant's conviction because of the prosecutor's failure to explain one of his strikes. Thus, Williams actually fell within the line of cases holding that "[w]here the challenged party's explanations for its strikes are a part of the record, those explanations must be reviewed by the appellate courts regardless of the manner in which they came to be in the record." Cox v. State,629 So.2d 664, 667 (Ala.Cr.App. 1992), reversed as to outcome,629 So.2d 670 (Ala. 1993). See also Jackson v. State, 594 So.2d at 1293, and cases cited therein.
** NOTE FROM THE REPORTER OF DECISIONS: On September 30, 1994, the Court of Criminal Appeals dismissed the appeal on motion of the appellant.